S

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **INDICTMENT** |
| | : | |
| **v.** | : | **CRIMINAL NO. 5:17-CR-**$\partial\varphi$ |
| | : | |
| **ISAAC J. CULVER, III,** | : | **VIOLATIONS:** |
| **DAVE CARTY,** | : | **18 U.S.C. § 1349** |
| **and** | : | **18 U.S.C. § 1343** |
| **PROGRESSIVE CONSULTING** | : | **18 U.S.C. § 1341** |
| **TECHNOLOGIES, INC.** | : | **18 U.S.C. § 1956(h)** |
| | : | **18 U.S.C. § 1956(a)(1)(B)(i)** |
| | : | **18 U.S.C. § 2** |
| | : | **18 U.S.C. § 981(a)(1)(C)** |
| | : | **18 U.S.C. § 982(a)(1)** |
| | : | **28 U.S.C. § 2461(c)** |
| | : | |
| | : | **UNDER SEAL** |
| | : | |

**The Grand Jury charges:**

## GENERAL INTRODUCTION

At all times material to this Indictment:

1. The Bibb County School District (herein after "BCSD") operates the public school system of Bibb County, Georgia.  The BCSD is controlled by the Board of Education, which is a policy-making body, elected by the citizens of Bibb County, who has the responsibility and authority to make policies covering the operation of the county's schools.

2. **Progressive Consulting Technologies, Inc**. (herein after "**PCTI**") was and is an information technology company located in Macon, Bibb County, Georgia.  **PCTI** provided software development, networking, and consulting services for federal, state, and local agencies.  On or about September 24, 2012, **PCTI** became the Technical Project Manager to oversee technology upgrades at the BCSD.

3. **ISAAC J. CULVER, III,** (herein after "**CULVER**") was the President/Chief Executive Officer of **PCTI**. **CULVER** owned fifty percent (50%) of **PCTI**.

4. **DAVE CARTY** (herein after "**CARTY**") was the Vice President/Chief Operating Officer (COO) for **PCTI**. **CARTY** owned fifty percent (50%) of **PCTI**.

5. CompTech Computer Technologies, Inc. (herein after "CompTech") provides support services for information technology, engineering, medical, technical data, and program management. CompTech is headquartered in Dayton, Ohio.

6. A.S. was and is the President and Chief Executive Officer of CompTech.

7. T.T. was the Executive Director of Technology for the BCSD from July 2012 through August 2013.

8. S.R. was employed with the BCSD as the Director of Accounting. S.R. took over the duties of the Chief Financial Officer of the BCSD sometime between on or about December 10, 2012, and on or about December 18, 2012, the exact date being unknown.

9. R.H. was the in-house counsel for the BCSD.

10. Ncomputing was a desktop virtualization company. Ncomputing, in part, provided desktop and application virtualization software, thin client devices, and other products and services. Ncomputing did not sell direct, thus, most purchases from Ncomputing had to be done through third parties, often referred to as partners.

11. On or about December 21, 2012, the BCSD paid CompTech $3,768,000.00 to purchase 15,000 Ncomputing devices and support services and installation for those devices.

12. The United States General Services Administration ("GSA") provides centralized procurement for the federal government. As part of its duties, the GSA maintains the GSA Schedules, which are listings of long-term government wide contracts that allow for the purchase of products

and services at volume discount pricing. Thus, other government agencies can use these Schedules to buy goods and services at a verified competitive price under the GSA multiple award schedule program.

13. Schedule 70 of the GSA features a variety of information technology products and services. In order for a company or business to be listed on Schedule 70, they must first apply with the GSA. The company must submit information outlining information on their company, experience, products, and services. The GSA then reviews, evaluates, and negotiates the information to determine if the company meets the qualifications to be placed on Schedule 70. Being placed on Schedule 70 does not mean that a company is guaranteed business. Rather, it means that federal, state, local, and tribunal government entities will see that company, along with the other companies on the Schedule, when looking for a company to fulfill a certain information technology need.

14. The GSA also has a Cooperative Purchasing Program, which, in part, allows state, local, and tribal governments to benefit from pre-vetted industry partners on information technology products and services by allowing them access to Schedule 70. This program allows eligible entities to purchase from Cooperative Purchasing approved industry partners on Schedule 70, at any time, for any reason, using any funds available.

## COUNT ONE
### (Conspiracy to Commit Wire and Mail Fraud)

### A. Introduction

1. The allegations contained in paragraphs 1 through 14 of the General Introduction of this Indictment are incorporated by reference as if set forth fully herein.

B. The Conspiracy and Its Objects

Beginning or about June, 2012, the exact date being unknown, and continuing until or about April 17, 2013, in the Macon Division of the Middle District of Georgia, and elsewhere within the jurisdiction of this Court,

**ISAAC J. CULVER, III,**
**DAVE CARTY, and**
**PROGRESSIVE CONSULTING TECHNOLOGIES, INC.,**

and others, both known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree with each other and with others, both known and unknown to the Grand Jury, to commit an offense against the United States, that is:

i.  to knowingly and willfully devise a scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations, and promises, and to transmit and cause to be transmitted by wire in interstate commerce some communication for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Sections 1343 and 2; and

ii.  to knowingly and willfully devise a scheme and artifice to defraud and obtain money by means of false and fraudulent pretenses, representations, and promises, and to use the mail or an in interstate carrier to mail or cause to be mailed some matter or thing for purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Sections 1341 and 2.

The objects of the conspiracy were:

1. To use CompTech as a pass through for wire and mail transfers of money in order to disguise from the BCSD that the BCSD was actually purchasing the Ncomputing devices, support

services, and installation from Defendants, thereby hiding Defendants' involvement in the transaction;

2. To induce CompTech into acting as the pass through by leading CompTech into believing the purchase was being made pursuant to CompTech's GSA Schedule and was an approved and appropriate means of conducting the transaction; and

3. To profit from the transaction with the BCSD by marking up the prices of the Ncomputing devices, support services, and installation.

## C. Manner and Means of the Conspiracy

The manner and means whereby the conspiracy was sought to be accomplished were as follows:

### Overview of BCSD Technology Upgrades

1. The BCSD was undergoing technology upgrades to the schools and school system. In 2011, the BCSD had an audit done to determine what technology upgrades were needed. In December, 2011, a report outlining the scope of work needed to upgrade the BCSD's technology was provided to the BCSD.

2. The report included recommendations that the BCSD upgrade its campus and classroom multimedia systems and personal computers. The report also indicated that seventy-five percent of computer equipment in the BCSD was outdated and non-functional. The report further recommended that the BCSD set a goal to have technology in the hands of students by providing an equitable division of computing devices.

### Selection of Technical Project Manager

3. On or about June 25, 2012, the BCSD opened Request for Qualifications (RFQ) No. 12-72 for Technical Project Management Services for the technology upgrades. The opening of RFQ

No. 12-72 allowed companies to submit proposals to become the project manager for the various technology upgrades with the BCSD. The Technical Project Manager would not be selected from RFQ 12-72. Instead, RFQ 12-72 was used to select pre-qualified candidates to respond to a later Request for Proposal (RFP), which would be the mechanism from which the ultimate Technical Project Manager was selected.

4. The chosen Technical Project Manager was ultimately to "provide technical project management and network management support to the Bibb County BOE," and "serve as the technical manager for the build-out of the network and act as their technical liaison to the commercial vendor, coordinating all aspects of the deployment for the district." They would also "provide on-site management of vendors at the various locations/schools," and "support the overall infrastructure upgrade." The Technical Project Manager would also "serve as an on-site resource for site coordination, troubleshooting, problem resolution, local inventory, and [would] provide customer service and guidance to the various site staff."

5. During the RFQ bidding process, questions were submitted to the BCSD, the answers to which were posted online for all applicants to review. During this process, the BCSD explained that the firm selected to be the Technical Project Manager would not be able to provide installation services and oversight services at the same time.

6. On or about July 10, 2012, **CARTY** attended a pre-bid conference for RFQ 12-72.

7. On or about July 13, 2012, **CULVER** sent A.S. an e-mail requesting a letter of reference for the Technical Project Manager for the BCSD. **CULVER** noted in this e-mail that the reference was "totally made up," and provided the wording for the written reference. The wording contained an outline of work **PCTI** performed for CompTech. In actuality, the described work never took place.

8. On or about July 18, 2012, **PCTI** submitted its Request for Qualifications Response to RFQ No. 12-72 with its proposal outlining **PCTI's** bid to be the Technical Project Manager for BCSD's technology upgrades.  Included in the proposal was a letter of reference from A.S. that matched the requested wording of the letter **CULVER** previously sent to A.S.

9. On or about August 21, 2012, T.T. sent an e-mail to **CULVER** informing him **PCTI** was one of the three firms selected to respond to RFP 13-09, which was the RFP from which the ultimate Technical Project Manager would be selected.  The scope of work for the Technical Project Manager outlined that the chosen firm would "provide technical project management and network management support to the [BCSD]."

10. The ultimate contract for the Technical Project Manager included all of the terms and conditions listed in the RFP 13-09 solicitation itself, any addenda to the solicitation, the chosen firm's response to the RFP, the intent to award notification letter, and the actual contract. Among those terms outlined in the RFP, which would become part of the final contract between the BCSD and the Technical Project Manager, was that "[t]he Technical Project Management firm shall not perform any portion of a project with his own forces except as may be approved by BCSD." (Emphasis in the original.)

11. On or about September 17, 2012, **PCTI** submitted its response to RFP 13-09.  This response was signed by **CULVER** and listed **CULVER** and **CARTY** as the principals of **PCTI**.

12. On or about September 20, 2012, the Bibb County Board of Education voted to authorize the District to negotiate a contract with **PCTI** to provide the Technical Project Management Services.

13. On or about September 24, 2012, **PCTI** signed a Services Agreement with the BCSD to provide the Technical Project Management services for the BCSD's technology upgrades. As explained in RFP 13-09, the terms of the RFP solicitation were part of this agreement.

### Involvement of CompTech

14. Sometime between mid-November, 2012, and before mid-December 2012, the exact date being unknown, **CULVER** told A.S. that the BCSD would be purchasing Ncomputing devices as part of its technology upgrades. **CULVER** asked A.S. if CompTech was on the GSA Schedule and A.S. confirmed that they were. **CULVER** thereafter asked if CompTech could procure the Ncomputing devices using CompTech's GSA Schedule and A.S. agreed to do so.

15. At this time, CompTech had recently been placed on the GSA Schedule and was not experienced in how the process was supposed to work. CompTech was aware, however, that it needed to pay a percentage of the amount of sales from the GSA Schedule to GSA as administrative fees.

16. Sometime in mid-December 2012, the exact date being unknown, **CULVER** told A.S. that T.T. had authorized the purchase and the BCSD would be purchasing the Ncomputing devices. **CULVER** further told A.S. to standby and **CULVER** would let A.S. know what needed to be done.

17. Shortly after **CULVER** told A.S. to be on standby, they discussed the purchase of 15,000 Ncomputing devices and **CULVER** told A.S. about the pricing and invoice, indicating to A.S. that **CULVER** had done the research and legwork necessary for the purchase.

18. It was CompTech's understanding, based on conversations with **CULVER**, that CompTech's only role was to allow the use of CompTech's GSA Schedule number to make the purchase. CompTech did not believe that it would be providing any actual goods or services to the BCSD.

Issuance of an Invoice to the BCSD

19. On December 17, 2012, **CARTY** sent A.S. an e-mail with a blank invoice totaling $3,768,000.00, requesting that A.S. transcribe the quote to CompTech's letterhead and send it back to **CARTY**. The breakdown of the items in the invoice were as follows:

| Description | Units | Cost Per Unit | Amount |
|---|---|---|---|
| Ncomputing L300 | 15,000 | $149.00 | $2,235,000.00 |
| 1 Year Warranty | 15,000 | - | - |
| vSpace Management Center | 15,000 | $29.35 | $440,250.00 |
| Premium Support vSpace Server (annual) | 15,000 | $34.25 | $513,750.00 |
| Premium Support vSpace Management Center (annual) | 15,000 | $15.15 | $227,250.00 |
| Ncomputing L300 Installation | 15,000 | $23.45 | $351,750.00 |

20. At **CULVER'S** direction, CompTech transcribed the invoice sent by **CARTY** on their letterhead. Also at **CULVER'S** direction, CompTech included CompTech's GSA Schedule number on the invoice.

21. On December 17, 2012, at **CARTY'S** request outlined above, A.S. sent **CARTY** an e-mail with the above described invoice totaling $3,768,000.00.

22. On December 18, 2012, at **CULVER'S** direction, A.S. sent T.T. an e-mail with an invoice for $3,768,000.00. The items and prices on this invoice matched those listed in the invoice **CARTY** previously sent to A.S. on December 17, 2012, as detailed in paragraph 19 above. The invoice was made out to T.T. at BCSD and contained CompTech's letterhead and GSA Schedule number.

23. On or about December 18, 2012, **CULVER,** T.T., and R.H. brought S.R. the invoice from CompTech to purchase the Ncomputing devices. **CULVER,** T.T., and R.H. told S.R. that the purchase had been approved and the money needed to be wired immediately. During this conversation, **CULVER** did the majority of talking.

24. On or about December 21, 2012, **CULVER** sent an e-mail to A.S. and copied T.T. In the e-mail, **CULVER** thanked A.S. for "agreeing to lower CompTech's profit margins on the sales of equipment to the school system."

Wiring and Mailing of Funds

25. On or about December 21, 2012, the BCSD wired $3,768,000.00 to CompTech. S.R. initiated the wire transfer by accessing the internet from her office at the BCSD in Macon, Georgia.

26. Per policy of the Board of Education, expenditures over $500,000.00 required approval of the Board. The Board did not approve or authorize this purchase.

27. On or about December 21, 2012, **CULVER** sent an e-mail to A.S., directing A.S. to wire $2,151,750.00 to **PCTI's** bank account with Bank of America in Tampa, Florida. **CULVER** told A.S. that he did not have the wire instructions for a second wire transfer, but the amount would be $1,509,730.00.

28. On or about December 24, 2012, CompTech wired $2,151,750.00 to **PCTI's** bank account with Bank of America in Tampa, Florida. This was the amount **CULVER** directed A.S. to wire to **PCTI** and the wire was sent to the account **CULVER** requested. CompTech initiated this wire from their local bank in Dayton, Ohio.

29. On or about December 24, 2012, **PCTI** wired $1,749,000.00 to Ncomputing to purchase the Ncomputing devices and services that were ultimately purchased by the BCSD. **PCTI's** purchase of the Ncomputing devices was not made pursuant to the GSA schedule.

30. On or about December 24, 2012, **CULVER** sent an e-mail to A.S. instructing A.S. to send **PCTI** a check in the amount of $1,537,990.00 via Fed Ex.

31. On or about January 3, 2013, CompTech wrote a check in the amount of $1,537,990 and mailed it from Dayton, Ohio to **PCTI's** office in Macon, Georgia. Thus, of the $3,768,000.00 that the BCSD wired to CompTech, all but $78,260.00 was wired and mailed to **PCTI**.

32. On or about January 29, 2013, CompTech made a payment to GSA in the amount of $16,138.13 to cover the administration fees it believed it owed to GSA for the purchase of the Ncomputing devices. Based on representations made by **CULVER**, CompTech believed the purchase of the Ncomputing devices was made through CompTech's GSA Schedule. As noted above, CompTech knew that it had to make such payment to GSA when a purchase was made utilizing the GSA Schedule. However, the purchase of the Ncomputing devises was not made in connection with the GSA Schedule thus, unbeknownst CompTech, did not have to make this payment to GSA.

<u>Installation of the Ncomputing Devices</u>

33. On or about December 28, 2012, **CARTY** received a letter from Ncomputing confirming **PCTI's** purchase of 15,000 vSpace Management Center licenses, 15,000 Premium Support and Subscription for vSpace Server for one year, and 15,000 Premium Support and Subscription for vSpace Management Center for one year. The letter confirmed that this purchase was for the BCSD. The items listed in this letter matched the items listed on the invoice sent to the BCSD as outlined in paragraph 22 above.

34. On or about January 3, 2013, the Ncomputing devices that were purchased by **PCTI** were delivered. The BCSD received the 15,000 Ncomputing devices that were purchased; however, they did not have key components necessary to make them functional such as monitors and keyboards.

35. Sometime in early 2013, the exact date being unknown, CompTech was asked about the installation schedule for the NComputing devices. Based on assurances from **CULVER**, A.S. believed that CompTech was not actually responsible for the installation. **CULVER** told A.S. that employees of **PCTI** would be conducting the installation of the devices. **CULVER** and A.S. then discussed CompTech possibly subcontracting **PCTI** employees to do the installation, with **PCTI** ultimately paying to cover the installation expenses. However, no contracts were signed between CompTech and **PCTI** for subcontracting employees.

36. On or about April 17, 2013, **CULVER** sent an e-mail to A.S. explaining that R.H. was putting together a timeline and record of payments from the BCSD to vendors for the prior year. In that e-mail, **CULVER** explained "Just to recap: Basically, Ncomputing offered the BCSD a 35% discount for purchases of devices that could be made before December 31, 2012. **PCTI** then asked CompTech if they could make the purchase of the devices and only take a 3.5% profit as a pass through for using CompTech's GSA schedule." A.S. continued to believe that the purchase of the Ncomputing devices was made by utilizing CompTech's GSA schedule.

37. On or about April 22, 2013, **CULVER** sent A.S. an e-mail letting A.S. know that two **PCTI** employees were doing the installation of the Ncomputing devices. **CULVER** told A.S. that so far, 300 devices had been installed.

38. On or about April 30, 2013, the BCSD requested that CompTech provide the BCSD with various documents regarding the Ncomputing devices. CompTech in turn contacted **CULVER** who provided information on the Ncomputing license confirmation, warranty, and license agreement for CompTech to provide to the BCSD. These documents were subsequently sent from CompTech to the BCSD.

## Results of Purchase of the Ncomputing Devices

39. The BCSD paid $3,768,000.00 for goods and services for which **PCTI** paid only $1,749,000.00. This purchase was made by **PCTI** using its own forces without the BCSD authorizing **PCTI** to do so.

40. Employees of **PCTI** installed 300 of the Ncomputing devices. As explained above, **PCTI** was prohibited from performing installation services while employed as the Project Manager for the BCSD.

41. To date, only 300 of the Ncomputing devices were installed throughout the BCSD and the remaining devices remain in storage as the BCSD deemed them unusable as the key components were not purchased.

42. The services the BCSD purchased for those devices expired on January 1, 2014.

## Transfers of Money to **CULVER** and **CARTY**

43. Following the money from the BCSD that CompTech wired to **PCTI**, **PCTI** thereafter wrote several checks to **CULVER** and **CARTY**.

    a. On or about December 21, 2012, **PCTI** wrote a check for $88,000.00 to **CARTY**.

    b. On or about December 24, 2012, **PCTI** wrote a check for $62,000.00 to **CULVER**.

    c. On or about January 4, 2013, **PCTI** wrote a check for $8,000.00 to **CULVER**.

    d. On or about January 18, 2013, **PCTI** wrote a check for $50,000.00 to **CARTY**.

    e. On or about January 19, 2013, **PCTI** wrote a check for $10,000.00 to **CULVER**.

    f. On or about January 21, 2013, **PCTI** wrote a check for $10,000.00 to **CARTY**.

    g. On or about January 28, 2013, **PCTI** wrote a check for $40,000.00 to **CULVER**.

    All in violation of Title 18, United States Code, Sections 1349 and 2.

## COUNTS TWO THROUGH ELEVEN
### (Wire Fraud)

That on or about the dates listed below, in the Macon Division of the Middle District of

Georgia, and elsewhere within the jurisdiction of the Court,

### ISAAC J. CULVER, III,
### DAVE CARTY, and
### PROGRESSIVE CONSULTING TECHNOLOGIES, INC.

aided and abetted by each other, and by others, both known and unknown to the Grand Jury, did

knowingly and willfully devise and intend to devise a scheme to defraud the Bibb County School

District, and to obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises.

### A. Background

1. The allegations contained in paragraphs 1 through 14 of the General Introduction of this
   Indictment are incorporated by reference as if set forth fully herein.

### B. The Scheme and Artifice to Defraud

2. The scheme and artifice to defraud and to obtain money by means of materially false and
   fraudulent pretenses, representations and promises is more particularly described in paragraphs
   1 through 43 of Section C of Count One of this Indictment and is incorporated by reference as
   if set forth fully herein.

### C. Execution of the Scheme

On or about the dates listed below, within the Middle District of Georgia and elsewhere

within the jurisdiction of the Court, Defendants, **ISAAC J. CULVER, III, DAVE CARTY, and**

**PROGRESSIVE CONSULTING TECHNOLOGIES, INC.,** acting jointly and as agents for

one another, for the purpose of executing the aforesaid scheme and artifice to defraud, caused to

be transmitted in interstate commerce, by means of a wire communication, certain signs, signals,

and sounds, as more particularly described below:

| Count | Date | Description of wire | Wire Origination Point | Wire Destination Point |
|-------|------|---------------------|------------------------|------------------------|
| **TWO** | December 17, 2012 | An e-mail sent from **CARTY** to A.S. with a blank invoice totaling $3,768,000.00, requesting that A.S. transcribe CompTech's letterhead onto the invoice | Macon, Georgia | Dayton, Ohio |
| **THREE** | December 18, 2012 | An e-mail sent from A.S., at the direction of **CULVER** and **CARTY**, to T.T. with an invoice for $3,768,000.00 | Dayton, Ohio | Macon, Georgia |
| **FOUR** | December 21, 2012 | An e-mail sent from **CULVER** to A.S., copied to T.T., thanking A.S. for "agreeing to lower CompTech's profit margins on the sales of equipment to the school system." | Macon, Georgia | Dayton, Ohio |
| **FIVE** | December 21, 2012 | A wired payment of $3,768,000.00 from the BCSD to CompTech | Macon, Georgia | Dayton, Ohio |
| **SIX** | December 21, 2012 | An e-mail sent from **CULVER** to A.S. directing A.S. to wire $2,151,750.00 to **PCTI** | Macon, Georgia | Dayton, Ohio |
| **SEVEN** | December 24, 2012 | A wired payment of $2,151,750.00 from CompTech to **PCTI** | Dayton, Ohio | Macon, Georgia |
| **EIGHT** | December 24, 2012 | A wired payment of $1,749,000.00 from **PCTI** to Ncomputing | Macon, Georgia | California |
| **NINE** | December 24, 2012 | An e-mail sent from **CULVER** to A.S. instructing A.S. to send PCTI a check for $1,537,990.00 via Fed Ex | Macon, Georgia | Dayton, Ohio |

| Count | Date | Description of wire | Wire Origination Point | Wire Destination Point |
|-------|------|---------------------|------------------------|------------------------|
| **TEN** | April 17, 2013 | An e-mail sent from **CULVER** to A.S. stating that Ncomputing offered the BCSD a thirty-five percent (35%) discount of the devices that could be made before December 21, 2012. **CULVER** further explained in this e-mail that PCTI asked CompTech to make the purchase and take a three and a half percent (3.5%) profit as a pass through for using CompTech's GSA schedule. | Macon, Georgia | Dayton, Ohio |
| **ELEVEN** | April 22, 2013 | An e-mail sent from **CULVER** to A.S. letting A.S. know that two **PCTI** employees were installing the Ncomputing devices | Macon, Georgia | Dayton, Ohio |

all in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT TWELVE
### (Mail Fraud)

That on or about the dates listed below, in the Macon Division of the Middle District of

Georgia, and elsewhere within the jurisdiction of the Court,

### ISAAC J. CULVER, III
### DAVE CARTY, and
### PROGRESSIVE CONSULTING TECHNOLOGIES, INC.

aided and abetted by each other, and by others, both known and unknown to the Grand Jury, did

knowingly and willfully devise and intend to devise a scheme to defraud the Bibb County School

District, and to obtain money and property by means of materially false and fraudulent pretenses,

representations, and promises.

A. Background

3.   The allegations contained in paragraphs 1 through 14 of the General Introduction of this

Indictment are incorporated by reference as if set forth fully herein.

B.   The Scheme and Artifice to Defraud

4.   The scheme and artifice to defraud and to obtain money by means of materially false and

fraudulent pretenses, representations and promises is more particularly described in paragraphs

1 through 43  of Section C of Count One of this Indictment and is incorporated by reference

as if set forth fully herein.

C.   Execution of the Scheme

On or about the dates listed below, within the Middle District of Georgia and elsewhere

within the jurisdiction of the Court, Defendants, **ISAAC J. CULVER, III, DAVE CARTY, and**

**PROGRESSIVE CONSULTING TECHNOLOGIES, INC.,** acting jointly and as agents for

one another, for the purpose of executing the aforesaid scheme and artifice to defraud, Defendant

knowingly caused to be delivered by a private and commercial interstate carrier the following

matter, as more particularly described below:

| Date | Description of mail | Mail Origination Point | Mail Destination Point |
|------|--------------------|-----------------------|------------------------|
| January 3, 2013 | A package containing a check for $1,537,990.00 sent via FedEx | Dayton, Ohio | Macon, Georgia |

all in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT THIRTEEN
### (Conspiracy to Launder the Proceeds of Unlawful Activity)

The allegations contained in paragraphs 1 through 14 of the General Introduction of this Indictment are incorporated by reference as if set forth fully herein.

### A. The Conspiracy to Launder the Proceeds of Unlawful Activity

That from on or about December 21, 2012, and continuing through on or about January 3, 2012, in the Macon Division of the Middle District of Georgia, and elsewhere within the jurisdiction of the Court,

### ISAAC J. CULVER, III,
### DAVE CARTY, and
### PROGRESSIVE CONSULTING TECHNOLOGIES, INC.

herein after Defendants, and others both known and unknown to the Grand Jury, knowingly conspired and agreed together and with each other, and with others both known and unknown to the Grand Jury, to commit offenses under Title 18, United States Code, Section 1956, that is:

i.     to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, that is, wire fraud and mail fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

### B. Objects of the Money Laundering Conspiracy

1. It was the object of the money laundering conspiracy that Defendants used CompTech as a pass through to disguise from the BCSD that the BCSD was purchasing the Ncomputing devices from Defendants, which was unauthorized by the terms of Defendants' agreement with the BCSD, thereby hiding Defendants' involvement in the transaction.

2. It was further an object of the money laundering conspiracy that Defendants induced CompTech into acting as the pass through of the wire and mail transfers of money by leading CompTech into believing the purchase was being made pursuant to CompTech's GSA Schedule and was an approved and appropriate means of conducting the transaction.

3. It was further an object of the money laundering conspiracy that Defendants profited from the transaction with the BCSD by marking up the prices of the Ncomputing devices

### C. Manner and Means of the Money Laundering Conspiracy

1. The allegations contained in paragraphs 1 through 43 of Section C of Count One of this Indictment are incorporated by reference as if set forth fully herein.

All in violation of Title 18, United States Code, Section 1956(h).

### FORFEITURE NOTICE
### (18 U.S.C. § 982(a)(1), 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c) – Criminal Forfeiture)

1.     The allegations contained in Counts One through Thirteen of this Indictment are hereby re-alleged and incorporated by reference into this Notice for the purpose of alleging forfeitures to the United States of America, pursuant to the provisions of Title 18, United States Code, Section 982(a)(1), and Title 18, United States Code, Section 981(a)(1)(C), in conjunction with Title 28, United States Code, Section 2461(c).

2.      Upon conviction of the offense(s) in violation of Title 18, United States Code, Section 1349 set forth in Count One; Title 18, United States Code, Section 1343 set forth in Counts Two through Eleven; Title 18, United States Code, Section 1341 set forth in Count Twelve; and/or Title 18, United States Code, Section 1956(h) set forth in Count Thirteen of this Indictment, the defendant(s),

**ISAAC J. CULVER, III,**
**DAVE CARTY, and**
**PROGRESSIVE CONSULTING TECHNOLOGIES, INC.,**

shall forfeit to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(C), in conjunction with Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s), or a conspiracy to commit such offense; and/or any property, real or personal, involved in such offense(s), or any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1), including, but not limited to, a money judgment in an amount to be determined.

3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant(s):

(a)     cannot be located upon exercise of due diligence;

(b)     has been transferred, sold to or deposited with, a third person;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be subdivided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section

982(b)(1), and Title 28, United States Code, Section 2461(c) through Title 18, United States Code,

Section 981(a)(1)(C).

All pursuant to 18 U.S.C. § 982, 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

A TRUE BILL.

*/s/ Foreperson of the Grand Jury*
FOREPERSON OF THE GRAND JURY

G.F. PETERMAN, III
UNITED STATES ATTORNEY
Presented by:

ELIZABETH S. HOWARD
ASSISTANT UNITED STATES ATTORNEY

DANIAL BENNETT
ASSISTANT UNITED STATES ATTORNEY

Filed in open court this _____ day of June, AD 2017.

Deputy Clerk